Good morning, Your Honors. Brenton Aiken-Hans from the Law Office of Jerry Steering on behalf of Appellants. If I may reserve five minutes of my time for rebuttal. So, Your Honors, this is a case about the limits of police officers' ability to react or, more appropriately, overreact to information that they receive and what reasonable inferences they can make from their observations or from the information they have. In this case, we have a situation where they have a secondhand report of reckless driving and somebody blindfolded. Can an officer reasonably infer from that that there's been a kidnapping and, further, that that kidnapping amounts to an exigent circumstance? And I think the answer to those questions has to be on both counts, no, like, absolutely not. And I think it's quite apropos that as we approach Halloween and we're going to have lots of people in costumes acting, you know, very silly in various festivities, that, you know, the court is mindful that normal people do things every day that might appear strange to officers. It can't be reasonably, without more, without concrete observations. Those types of observations cannot be the basis for calling in a SWAT team, for taking it, you know, and for conjuring up a militarized response to things like that. So, talking, addressing first Apelli's contention about this idea of a constructive detention. Now, the cases in this circuit that talk about violations of the Payton rule, that is an in-home arrest without a warrant, they all talk about constructive entry. They don't talk about whether it's a constructive arrest or a constructive detention. And I think if you adopt Apelli's reasoning about a constructive detention, you could, the court could decide Payton differently just by calling the arrest a detention. Same thing with every, all of these other cases in this circuit involving ordering people out of the house. So, cases such as Nora, Al-Azawi, and the Johnson case where officers ordered the man out at his front door. Those cases could all be decided differently if the court adopted Apelli's reasoning that just calling it a destructive, sorry, a constructive detention changes the character of it. And the truth is, really it doesn't matter. The officers are making an entry into the home by ordering the suspect out. And a direct threat of arrest is certainly, in my view, that's a lot more clearly a violation of the Fourth Amendment than pointing guns or, you know, a show of force, as this court has determined, you know, that that's coercing somebody out of the door against their will. Certainly directly threatening somebody, saying, if you don't come out, I'm going to arrest you. There's no way that that is less of a coercion than just a show of force. Assuming it was an arrest, can you address the probable cause issue here for the arrest? Sure. So there is no probable cause. So the allegation... First of all, what was he arrested for? Allegedly 148. But we're talking, I guess, so we have the issue of the probable cause to give them, you know, to order him out of the house in the first place. And then allegedly after he got out of the house, they start saying that he resisted arrest. I believe you're asking about in the first place. Is that correct? I think, yeah. I'm sorry, I don't want to infer the question, but Judge Lee, I think Judge Lee's question, you know, was what probable cause? I think, meaning, you know, when they, when he was still inside the house. Okay. When he was still inside the house. But probable cause for what? What's the charge? What's the violation? Could you clarify who you're talking about? We've got three individuals here. Okay. Well, there's probable cause for none of them, but I'm talking about Stephen Hill and Brett Hill specifically. So when they're still in the house, the reason why the officers allegedly ordered them out is they have a report of somebody driving erratically who is blindfolded. And the argument, which I do not agree with, is that that amounts to probable cause for kidnapping. I don't believe that the record supports that. I don't believe that's a reasonable inference from those facts. Now, after Stephen Hill exits the house in response to ordering him out, there's this allegation that he resisted them taking him into custody, which those, the facts bearing on that are disputed. So Pelley's argued that he, you know, pulled away and, you know, that he did all these things to resist. He disputes all of that. And there's no way he can reach the conclusion that a 148 is justified. I believe there's some additional facts that they're citing in support, but as far as, you know, physically taking him into custody, there's no way that the record would support a 148 charge unless you just adopted Pelley's construction of the facts, their view of the facts. If the facts are disputed, they must be resolved in our favor. And that is that appellant Hill, Stephen Hill, nonviolent, did not resist and complied at all times. Now, as far as, so they're also alleging that him refusing to assist them in the investigation and closing a window amounts to a 148. At that time, they didn't have probable cause to be on the property in the first place. If you look at the... But isn't the context here important? Now we know the facts. We know it was a great mistake here, but, you know, you would want, if the police get a call saying, I see someone driving erratically, there's a woman who's blindfolded and they get the information, you want the police to investigate. And when they arrive at the home, the people are being very evasive, closing the door, not responding. You know, ex ante, wouldn't you want the police to investigate something like this? Especially if it turns out that it actually was a kidnapping and they're exigent circumstances and the police are, you know, have a blasé attitude, I think we'd be criticizing the police officers now for not doing enough. That's possible. And, you know, I understand your point of view, Your Honor. As somebody who personally supports police a lot of the time, I think that's a tough balance to strike for the court. And that's something that, you know, I would want them to, if they had something that was a little more clear and concrete, I would want them to investigate. And if they really honestly thought that it was a kidnapping, I would want them to investigate. But I would that investigation to be reasonable. And that comes down to, you know, normal, law-abiding people who are often caught in the middle of this, you know, fight between people who want, you know, no police intervention and then people who want too much police intervention. And there has to be a reasonable spot in between. And the Hills are those normal people because here, all he did, his, you know, his great crime here is questioning them and not wanting to assist them in their investigation. And it turns out the Hills' point of view was vindicated in the end because there really, there was no kidnapping and it was an unreasonable inference from the facts presented. So just to answer your question, Judge, I would want them to address, you know, any sort of allegations, anything that was, you know, clearly suggested kidnapping, I would want them to investigate that. But I don't want them to go overboard and make unreasonable inferences and then, you know, take a drastic, violent response that potentially puts innocent people in harm's way. And, you know, people have been killed from, you know, an overreaction from police responding to certain reports. I wouldn't want any innocent people caught up in that. And I guess that then goes to, you know, isn't this kind of a classic case of, you know, qualified immunity, at least for Steve and Hill? I mean, this is the type of reason why or, you know, if you can address that, if there's any clearly established law. Sure. Well, there is, the law is clearly established, but qualified immunity cannot apply for several reasons. And the reason why it can't apply is because there are multiple reasons why their acts were unlawful. So for one, the law of this circuit requires that you have both probable cause and exigent circumstances. If either one of those was missing, you could talk about it being a Fourth Amendment violation. In this case, both were missing. And what that does is that takes it out of the realm of qualified immunity because no reasonable officer can argue that, well, even though we were missing exigent circumstances, you know, we still had probable, we still reasonably were mistaken about probable cause. And so it was, so it was, you know, we deserve qualified immunity for ordering them out. If you argue, if you, under these circumstances, I don't believe there's any reasonable argument that they had exigent circumstances. If you're missing exigent circumstances, it's clearly established in multiple cases in the circuit that you need that if you're going to order somebody out of the house, you know, instead of going and getting a warrant. Because, you know, that would suggest that there's some sort of emergency at hand that you had to order them out. So you're missing exigent circumstances. I guess there, I mean, it seems like there is exigent circumstance here. Again, you know, police receives a tip from a citizen saying, car driving a radically woman, blindfolded, and you want to go to the home and see if it's there, something terrible might be happening at the home. It seems, again, they were mistaken here, but it seems like that that is exigent circumstance. Based on those facts, if you were to draw that inference, terrible things could be happening at a lot of people's homes. And I don't think you can reasonably make the inference that it was a kidnapping. In fact, that was not what the report was. The report was that there's reckless driving with somebody that's blindfolded. And it seems to be that the officers sort of, you know, jump to this because that's one of those allegations, like pedophilia or terrorism, that when people hear those words, they all of a sudden react like, okay, we need to, you know, break all the rules, bend all the rules to get the bad guy. You know, it's a kidnapping. We don't want someone to get hurt. You take any other crime, though, and you put those same facts, but just with reference to a different crime, it becomes a lot clearer that you can't infer that somebody's being kidnapped just based off of an allegation of a blindfold with somebody reckless driving. And that's, it's debatable that you could even suspect that. But if we're talking about probable cause, it falls far short of probable cause. At most, I would concede that possibly it's a suspicion and, you know, a reason to want to question somebody about it. But that's as far as I would go with that. If you start saying that it's probable cause, what isn't probable cause? As I said before, we're coming up on Halloween. A lot of people are going to be dressed up in a lot of crazy ways. Are you telling me that an officer is going to have, you know, discretion to just look at any one of these people with their with their crazy weird activities and then decide that, you know, I'm going to investigate them for whatever, whatever inference I'm going to draw based on their costume? And, you know, that's, but that's what's happening here. You have somebody who is, I believe they were on some sort of a, an anniversary dinner, blindfolded, taking, taking them somewhere for like a surprise. You're going to, and somebody sees that and then reports a reckless driving. You're going to say that that's a kidnapping. I think most people, the reaction of most people would be like, that is, that's insane. That's, that is, you can't draw that inference just from those facts. At most, it's cause to, to maybe ask some questions. Counselor, your clock. Thank you. Great. Thank you. Good morning, your honors, and may it please the court. Colin Burns appearing on behalf of the city of Fountain Valley and all defendants. I think this case involved diligent police work. Officers went out on a very suspicious call to check the well-being, and as they were there, the facts unfolded of a real probability of something more significant. They had to act quick. They had to act decisively, but they acted reasonably. They did everything they could within the law to make sure that if there was a person inside who needed help, they were able to protect her, well, despite the lack of cooperation, despite obstruction from the plaintiffs. Ultimately, there was a confrontation. Officers had to use minimal force. That minimal force was to make sure the officers were safe while they looked after the safety of the resident. Trial court. Well, back up a little bit. I don't think I got it from the brief, but let me ask you this. Are you claiming the defense in this case claiming that there was probable cause for any offense when the officers arrived, first arrived at the house? No, your honor. No. Correct, your honor. No, we are not. So did probable cause arise at any time during the incident? And if so, for what offense? At the time the officers were going to the house, they had a report, sorry, to directly respond to your question. As soon as Stephen closed the windows, the officers had probable cause of a possible kidnapping and obstruction under 148. When he closed the window shade? Yes, your honor. Why is that? What facts give rise to probable cause for a kidnapping? The facts involve more than just the 911 report. It's 9.02 p.m. The officers received the report. They go to the property. They see a closed garage with no windows where the car could be. They make contact with Teresa, and your honors, I refer to plaintiffs by their first name only for clarity, not for disrespect. They see a garage with no windows where the Mustang could be. They make contact with Teresa, who informs them Ben, the person driving the car, does live there. He was not home. Then Teresa is evasive. Then they make contact with Stephen. They inform Stephen that there was a possibility of crazy driving and a woman with a blindfold. He is also evasive. Neither one of them will provide a phone number. Stephen eventually goes inside the house. Officers are left on the driveway waiting for Stephen or Teresa to come back out with a phone number so that they can contact Benjamin and clear everything up. The entire time they're out, they're worried that they're trying to contact Benjamin to warn him. In fact, as Teresa admitted during her deposition, that's exactly what she was doing. And as they're standing out there, they look through a window and they see a person who matches the description of their suspect, a white male, 25 years old, dark hair. As they see him, he runs or walks or whatever, but he hides out of the view of the officers. After the officers say, hey, come here, dude, he leaves and hides. Then Stephen walks up. Officers, Stephen already told them Ben wasn't home. Officers say, who's that other person over there? Stephen doesn't respond. He shuts the curtains on the officers. At that point, the officers know they have a report. They received word from Teresa and Stephen that Benjamin wasn't home. They refused to give the number. Now they've seen their suspect. Now they have cause that Teresa and Stephen lied about Benjamin being home, that for some reason they were trying to help him evade the officers. And therefore, I believe they have cause that there's something going on in that house, that something involves their suspect who they saw, and it also involves a woman who was blindfolded. Can you address the mother, Teresa? Because the evidence there, at least in the record, seems the weakest there. I mean, what's the probable cause for arresting her? And did the district court make any finding on that? It wasn't really clear from the district court opinion if it specifically ruled with respect to Teresa. The issue with Teresa, Teresa would have the same 148 issue if she was helping Benjamin evade, but the officers never actually arrested Teresa. Teresa never went outside. So even if she was ordered directly, an arrest in the constitutional sense requires either physical force or submission to authority. When the officers ordered, for purposes of summary judgment, we agreed it was Brett and Stephen. When the officers ordered them outside, only Stephen left. Teresa stayed inside and locked the door behind him. So she did not submit to authority. She had no intent of submitting to authority. When the officers finally did get into the dark entryway, they had a door in front of them. They didn't know how many people were inside the home. They did know they were outnumbered. They had no idea whether there were weapons. They were able to look over and see through the window in the top by standing on their tippy-toes and trying to flashlight in. They saw that Stephen was blocking the doorway so that Brett couldn't come out. They ordered, they stated, come out here so we can identify you. Unless you want to be arrested for obstruction, come out here now. Stephen came outside. An officer put his foot in the doorjamb. Stephen slammed the door. It hit the officer's foot, probably unintentionally. But then Stephen is right next to the officers by about inches. Officers are still next to a closed door. Stephen puts his left hand up as if to push through them. The officers go to grab Stephen. He backs up into the entryway. They finally grab his elbow and his wrist. They escort him out to the grass because they were standing on concrete. As they're doing this, you can see on the video Stephen locking his arms out. When they finally reach the grass, officers, still with one hand on his wrist, place another hand on his back, push him down to his knees first. This wasn't a situation where the officers did a judo throw and put somebody down on concrete on their face. They put him down on his knees first. There are photos in the record that show that Stephen has absolutely no injuries on his knees or his legs or his arms. After they did that, they placed their hands on his back, pushed him down to prone. Unfortunately, he had his glasses on top of his head. As they did that, his head hit the grass. His glasses did cut his forehead. That is an unfortunate fact that there is an injury. An injury doesn't necessarily mean officers use too much force. There's an explanation here. It doesn't take much force for glasses to cut a forehead. After they did that, the officers placed a knee on his back. They laid him out to prone, and then they handcuffed him. They picked him up. Then Brett and Teresa, on their own, to find out what was going on with Stephen, ran outside. As they did, officers found out this was just a giant mistake of identity. But I think that the officers acted appropriately in investigating this very serious allegation. The order outside. We believe it was a constructive detention. We believe it was a constructive detention because the order to come out or they will be arrested was couched with, we need to identify you, and it was qualified. A reasonable person in that circumstance wouldn't feel like they're going to step outside and be handcuffed and placed into a police car to be driven to answer charges. A reasonable person would understand the police are just trying to clear up who this unknown person was. I understand that the Hills say the city acted inappropriately, this entire incident could have been avoided with just the slightest amount of cooperation. I know they're saying that they were protecting their son Benjamin. Officers were trying to protect Darcy, the blindfolded female, who is also their family. And if this incident had led the police to any other residents besides the Hills, the Hills would have expected and demanded they did at least as much there. The suspect ultimately was Brett. He was very similar looking to Benjamin. What do you say to the argument advanced by appellant that to take the report of erratic driving with a blindfolded woman to the leap of kidnapping is too far? I say that that wasn't the only facts the officers were confronted with. The officers were confronted with the evasion. They were confronted with seeing their suspect who ran and hid. And then Mr Hill Stephen coming and closing the curtains. That suggests they're preparing to do battle. That suggests a number of things that is far beyond a simple report of erratic driving and a blindfolded passenger. When you say evasion, though, another way to look at it is, you know, they're just exercising their constitutional right, right? Not to let somebody, you know, in the house without a warrant, unless there's no probable cause and exigent circumstances where they weren't weren't at the time. So it's not. It's not necessarily evasion. I mean, that's kind of, you know, one side of the way of looking at it, isn't it? It is exercising their constitutional right to, you know, protect their home. Correct. Your Honor, a party has a constitutional right to not respond to the police, right? They don't have a constitutional right to obstruct a police investigation. Well, wait a minute. They're not obstructing it if they refuse to cooperate. That's not obstruction under California law. Under a case called People vs. Green, officers went out to do a welfare check on a family. As they did, the father let them in. He intimidated the minor children about speaking with them. That was 148. So it doesn't necessarily involve a forceful obstruction. Here there were two obstructions. First was Stephen closing the windows while the officers were trying to talk to a third party. And then it was Stephen standing in front of the doorway, blocking the third party from coming outside to talk to the officers. I missed that part. He was blocking the third party from coming. Who was he blocking? Teresa? No, Your Honor. Brett, who officers thought was Benjamin. Why was he blocking Brett? I thought Brett kind of disappeared in the back somewhere. This was after they walked to the front entryway. And Brett was there with him? Yes, Your Honor. I missed that. But that's in the record? Yes, Your Honor. Well, I don't know where they took it up. So it was reasonable for the officers to believe that he was blocking Brett from coming out? Yes, Your Honor. Is that what you're saying? Yes. He was standing next to the door. Brett was standing facing him. From what they could see, from being on their tiptoes, looking through the window at the top of the door. But isn't it true that the matched the subject, which was actually Benjamin? Is that right? Yes, Your Honor. These two boys should never have the first initial. The first initial, they were from the same family. They looked very similar. And when officers see a person who matches a description of their suspect, and that person runs and hides, and then another person from the house closes the window, which suggests they're about to do battle, officers at that point have to think that there's something serious going on. And I think if there was a female in trouble, and the officers didn't do more to investigate, I think the public would think that these officers didn't do their job. I'm going to go back to Teresa. I know your response was that she wasn't seized because she didn't submit to authority. If you assume that she was seized or arrested, did the police have probable cause to arrest her under 148? No, Your Honor. I don't think that they did. Looking to the force used, I'd like to respectfully invite this court back to the Blankenhorn case. Looking at an excessive force case, there are three factors. The force used, the government interest, and balancing the factors. The force used in this case was the pushing him to prone, then placing a knee on his back. In Blankenhorn, there was a female at a picnic. She was already down on her knees. Three officers came, pushed down on her back, placed a knee on her back, put her in handcuffs. She suffered a broken finger. They lifted her up roughly, placed her in the back of a police car, rolled up the windows on a 90-degree day to adjust her attitude. She claimed that that was excessive force. The Ninth Circuit reviewing that case said, even assuming that the plaintiff's statements are correct, the force used was less than that used in Blankenhorn. It's less than other cases addressing takedowns in the Bremerton case, Your Honor. I'm sorry, I was citing the court to the wrong case. In Blankenhorn, the plaintiff was gang-tackled, rip-hobbled, and punched while he was on the ground. In the Santos v. Gates case, a person was dropped on his buttocks and broke his back. In another case called Rice that this court recently issued, a person was taken down by being thrown from his feet to his face directly down on concrete. In all those cases, the force was substantial. Here, the force considered was minimal. When comparing that to the fact that the officers are investigating a very serious crime, the fact that the officers are in a dark entryway inches from the plaintiff here, also on the side of a closed door, I think that the government's interest here is a lot more substantial than the interest in Santos, which is public intoxication. Blankenhorn, which was trespassing in an open-air mall, the block at Orange. Or Rice, which was failing to give a driver license and ID. I think the officers acted reasonably in this case. Officers are expected to take these cases seriously. If a victim is in trouble, I think the public expects them to do something. We ask this court to affirm. Unless there are other questions, thank you for your time. Great, thank you. Thank you, Your Honor. So briefly, I'd just like to point out that a really easy way to resolve this case, if you look at the arguments the appellees are making, a lot of them revolve around disputes of fact. That if you accept them in their favor, their argument is they win. And if you don't accept them in their favor, then it goes the other way. That would be an easy way to resolve this case, is all the disputes of fact, they must be resolved in favor of appellant. But I'd like to address this suggestion that closing windows amounts to doing battle. That actually goes right in line with what I was saying before about how this case is really about just sort of this overreaction to observations that really don't warrant it. So you're telling me if somebody closes a window, that's okay. They're ready to do battle. Now it's guns out, SWAT team come in. Somebody's going to get hurt that way. Innocent people are going to get hurt. And I request this court, you know, think about the way that these rulings affect normal, law-abiding people. They might not want to have somebody looking in their window. They might not even know it's a police trainer from the California Supreme Court, the policy wizard he was. He noted that if the mere assertion, so in the face of reasonable suspicion of crime, if the mere assertion of a Fourth Amendment right to not let officers in the house converted that into probable cause, the mere assertion of the right would be, the Fourth Amendment right would be vitiated by its assertion. In other words, it's the fact that you assert it is going to erase it. I don't think this court should let that happen. It should take very great care to make sure that doesn't happen in ruling. Mr. Collins' argument is that at a certain point, I think he said when the blinds are closed on a window, but at a certain point, probable cause arose for a violation of 148, right? That's what he's arguing. Now, you agree with that? No, I don't. Because, first of all, nobody in the house had an obligation to assist the officers. It's an assertion of a Fourth Amendment right to close the windows so the officers don't have a right to be on the property, them looking inside. Closing the windows can be seen as an assertion of the Fourth Amendment right. They also don't have an obligation to go and tell them everything that they know about Benjamin, and they have a right to be skeptical of what the police officers are doing in this case. A lot of people are skeptical of what the police are doing, and they have a right to be, and that's what the Fourth Amendment is supposed to protect. Any further questions about anything? No. Great. Thank you both for the argument. The case has been submitted.
judges: TASHIMA, LEE, Freudenthal